UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Sandra K. Fiecke-Stifter and The Estate of Doris M. Fasching, *by and through Personal Representative Sandra Fiecke-Stifter, on behalf of themselves and all others similarly situated*, | File No. 22-cv-3056 (ECT/DTS) |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| MidCountry Bank and Taft Stettinius & Hollister LLP, | |
| Defendants. | |

Carl E. Christensen and Christopher Wilcox, Christensen Law Office PLLC, Minneapolis, MN, and Thomas J. Lyons, Jr., Consumer Justice Center P.A., Vadnais Heights, MN, for Plaintiffs Sandra K. Fiecke-Stifter and The Estate of Doris M. Fasching.

Jason R. Asmus, Justin P. Weinberg, and Schaan Barth, Taft Stettinius & Hollister LLP, Minneapolis, MN, for Defendants MidCountry Bank and Taft Stettinius & Hollister LLP.

Plaintiff Sandra K. Fiecke-Stifter alleges that Defendants unlawfully foreclosed on a home that had been owned by Sandra's late mother, Doris M. Fasching. Defendant MidCountry Bank was the lender, note holder, and mortgagee. Defendant Taft Stettinius & Hollister represented MidCountry Bank in the foreclosure. Sandra asserts claims against the bank for breach of contract and under the federal Truth in Lending Act ("TILA"). She asserts a claim against the law firm under the Fair Debt Collection Practices Act ("FDCPA").

Defendants seek judgment on the pleadings under Federal Rule of Civil Procedure 12(c), and their motion will be granted in part. The breach-of-contract claim rests on implausible interpretations of the at-issue contract, so it will be dismissed. The TILA claim also will be dismissed because, as pleaded, there is a disconnect between the specific statutory provision on which the claim relies and claim's supporting allegations. This means MidCountry will be dismissed from the case. The FDCPA claim against Taft will be dismissed to the extent it relies on legally unavailable theories. The claim will be allowed to proceed only to the extent that Taft's arguments for dismissal require construing facts in Taft's favor.

I[1]

*Doris had a home and a mortgage.* Doris owned a home in Hutchinson, Minnesota. Am. Compl. [ECF No. 31] ¶¶ 17, 21. In December 1998, Doris and her husband, Harold, secured a credit line from MidCountry. *Id.* ¶ 19; *see* Note [ECF No. 9-1]. The credit line was secured by a mortgage against the home. Am. Compl. ¶ 20; *see* Mortgage [ECF No. 9-2]. The Note and Mortgage were subsequently amended three times—first in October

---

[1]  Defendants' Rule 12(c) motion challenged Sandra's original Complaint. *See* ECF Nos. 14, 16. After the motion was fully briefed, however, the parties stipulated that Sandra could file an Amended Complaint. *See* ECF No. 25. The parties agreed that the Amended Complaint's filing would "not alter, delay, or change the [Rule 12(c)] motion's current briefing schedule" and that Defendants would not be required "to file a new or renewed" Rule 12(c) motion. *Id.* ¶ 2. Magistrate Judge David T. Schultz subsequently entered an order approving the parties' stipulation, and Sandra filed the Amended Complaint. ECF Nos. 30, 31. As I understand the situation, then, the parties intend Sandra's Amended Complaint to be the operative pleading for purposes of the motion, meaning it is the source of the factual allegations described herein.

2003, then in February 2008, and finally in February 2013. *See* ECF Nos. 9-3 through 9-8.

*Doris died a widower on September 21, 2021.* Am. Compl. ¶¶ 11–12. Harold predeceased Doris. *Id.* ¶ 12. When she died, Doris was current on all payments and "in good standing" with the MidCountry credit line. *Id.* ¶ 23. Three of Doris's children—Sandra and her two brothers—were Doris's "only heirs." *Id.* ¶ 16. "A probate matter was commenced to probate [Doris's] estate on December 6, 2021." *Id.* ¶ 14. Sandra was the personal representative of Doris's estate and continued to reside in the home after Doris's death. *Id.* ¶¶ 15, 24.

*MidCountry, represented by Taft, foreclosed on the home in early 2022.* MidCountry started a foreclosure-by-advertisement proceeding on February 1, 2022. *Id.* ¶ 30. Sandra was served with a notice of the foreclosure sale on February 18, 2022. *Id.* ¶ 38. The home was sold at a sheriff's auction on April 7, 2022. *Id.* ¶ 41. Sandra paid $77,159.29 to redeem the property. *Id.* ¶ 44. The parties disagree regarding MidCountry's justification for the foreclosure.

*Sandra alleges that MidCountry foreclosed because of Doris's death.* The MidCountry mortgage says that MidCountry "may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of . . . any . . . transfer . . . of the Property." Mortgage [ECF No. 9-2] ¶ 7. The mortgage also classifies any transfer of the property or a sole mortgagor's death as events of default. *Id.* ¶ 8. According to Sandra, MidCountry asserted that Doris's "death was a condition of default that accelerated the entire loan balance to be due and owing." Am. Compl. ¶ 27. Sandra

3

alleges specifically that a Taft attorney communicated this justification for MidCountry's default determination "during and after the foreclosure." *Id.* ¶ 28. Sandra also alleges that MidCountry asserted this justification in the foreclosure proceeding. *Id.* ¶¶ 33–34. According to Sandra, the foreclosure could not have been based on a failure to make payment when due because, at least as of January 2022, Sandra had "continued to make payments" on the credit line, and a MidCountry representative had "confirmed that she was current on payments." *Id.* ¶¶ 25, 37. Sandra alleges that in March 2022—just prior to the sheriff's sale—MidCountry "refunded" payments she had made on the credit line in the amount of $2,708.46. *Id.* ¶¶ 39–40.

*MidCountry and Taft claim that foreclosure occurred because of a failure to make payments when due.* In their Answer, MidCountry and Taft allege that "from October 2021 until MidCountry elected to terminate and accelerate payment of the Note in late December 2021, the Note was materially breached multiple times for failure to timely make monthly payments in full in October, November, and December 2021." Answer [ECF No. 9] ¶ 22. To support these assertions, MidCountry and Taft attached to their Answer copies of billing statements, past-due notices, and a payment transaction record. *See* ECF Nos. 9-9 through 9-13. Taken at face value, these documents tend to show that timely, full payments had not been made during that period. *See id.*

*Sandra brought this case in December 2022.* She asserts three claims: (1) a breach-of-contract claim against MidCountry, Am. Compl. ¶¶ 72–91; (2) a TILA claim against MidCountry, *id.* ¶¶ 92–102; and (3) an FDCPA claim against Taft, *id.* ¶¶ 103–115. Sandra asserts the breach-of-contract and TILA claims on behalf of herself and Doris's

4

estate. *See id.* ¶¶ 75–76, 94. It is not clear whether she asserts the FDCPA claim only on her own behalf or also on behalf of Doris's estate. *See id.* ¶¶ 104, 109, 111–112. Sandra also seeks to represent a class of individuals defined to include:

> (i) all consumers statewide (ii) against whom Defendant MidCountry Bank asserted an event of default under a note or mortgage resulting from death of a borrower, against whom Defendant MidCountry Bank exercised a due-on-sale option in a mortgage, and whose Real Property Defendant Taft foreclosed; (iii) for which the exercise of the due-on-sale clause was prohibited under law or contract; (iv) in an attempt to accelerate debt secured by a mortgage and collect that debt, which is debt incurred for personal, family, or household purposes as shown by Defendant's or the creditors' records; and (v) allegedly due for a home mortgage.

*Id.* ¶ 56.

II

The case's procedural posture deserves discussion in view of how MidCountry and Taft present their motion. "Judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." *Lansing v. Wells Fargo Bank, N.A.*, 894 F.3d 967, 971 (8th Cir. 2018); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Cargill, Inc.*, 61 F.4th 615, 619 (8th Cir. 2023) (same). "As numerous judicial opinions make clear, a Rule 12(c) motion is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties . . . . The motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court." 5C Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367 (3d ed. 2004).

5

A Rule 12(c) motion for judgment on the pleadings is assessed under the same standard as a Rule 12(b)(6) motion. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

As with Rule 12(b)(6) motions, "courts are not strictly limited to the four corners of complaints," when deciding Rule 12(c) motions but may consider other matters, including "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned[] without converting the motion into one for summary judgment." *Dittmer Props., L.P. v. F.D.I.C.*, 708 F.3d 1011, 1021 (8th Cir. 2013) (quotations omitted); *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526–27 (8th Cir. 2017) (explaining that consideration of matters outside the pleadings or evidence in opposition to the pleadings generally converts a Rule 12(b)(6) motion into one for summary judgment). When a contract is the basis of the dispute, that contract is

6

"necessarily embraced" by the pleadings and may be considered. *Zean*, 858 F.3d at 526–27.

Here, MidCountry and Taft have submitted many documents in support of their motion. They rely on seventeen documents attached to their joint answer, *see* ECF Nos. 9-1 through 9-17, and they rely on one additional document submitted with their reply brief, *see* ECF No. 24-1.

Some of these documents appropriately may be considered in adjudicating Defendants' Rule 12(c) motion. The original note and mortgage and subsequent amendments together comprise the contract under which Sandra asserts her breach-of-contract claim, and Sandra has not questioned the authenticity or accuracy of these documents. *See Zean*, 858 F.3d at 526–27. These documents appear in the record as exhibits 1 through 8 to Defendants' joint answer. The McLeod County Sheriff's certificate of service, the notice of foreclosure sale accompanying it, and the affidavit attesting to the foreclosure notice's publication seem like classic examples of public records. *See Wiggins v. Ocwen Loan Servicing, LLC*, No. 15-14238, 2017 WL 476384, at *1 n.1 (E.D. Mich. Feb. 6, 2017). Sandra has not questioned these documents' authenticity, either. These documents appear in the record as exhibits 15 and 16 to the joint answer.

Other documents cannot properly be considered. These include the billing statements, past-due notices, and other MidCountry records purporting to show the credit line's status. These documents appear in the record as exhibits 9 through 13 and 17 to the joint answer. They do not appear to fall within any of the categories the Eighth Circuit has said are fair game for a Rule 12(b)(6) motion or, by extension, a Rule 12(c) motion. *See*

7

*Dittmer Props.*, 708 F.3d at 1021. The documents are corporate records generated by MidCountry. And to the extent they are introduced to show either that a default resulted from a failure to make full, timely payment or that MidCountry did not foreclose because of Doris's death, Sandra disputes their accuracy. She alleges both that she was current on payments and that MidCountry declared default because of Doris's death. *See* Am. Compl. ¶¶ 27, 28, 37; *see LeMay v. Mays*, 18 F.4th 283, 288–89 (8th Cir. 2021) (refusing to accept the movant's characterizations of evidence at the motion-to-dismiss stage).

It seems unnecessary to decide whether two other documents may or may not be considered at this stage. The first is a pre-foreclosure notice, attached as exhibit 14 to the joint answer. This is a corporate record generated by Taft. Its relevance to the issues for decision, if any, is not clear. The second is a "Sheriff's Certificate and Foreclosure Record" filed with an affidavit accompanying Defendants' reply brief. ECF No. 24-1. Much of what is in this document appears in exhibits 15 and 16 to the joint answer. In other words, to the extent this document may possess distinct relevance, its contents appear in other exhibits that appropriately may be considered.

### III

### A

First consider whether Sandra plausibly alleges a breach-of-contract claim. Sandra claims that the mortgage, note, and their amendments are the contract. Am. Compl. ¶ 74. Sandra identifies two specific grounds for this claim in the Amended Complaint. First, she alleges that the contract incorporated a federal regulation that forbids a lender from exercising its option to declare default because of a borrower's death. *Id.* ¶¶ 79–80. As

8

Sandra describes it, the contract provided that its due-on-sale clause was "'subject to the restrictions imposed by federal law (12 C.F.R. 591) as applicable.'" *Id.* ¶ 79. The text supporting this allegation appears in the Mortgage as follows:

> **7. DUE ON SALE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, transfer or sale of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Security Instrument is released.

ECF No. 9-2 ¶ 7.[2] Sandra claims that the regulation referenced in this paragraph prohibits a lender from "enforc[ing] a due-on-sale clause because of a borrower's death." *Id.* ¶ 80. Sandra alleges that MidCountry breached this contractual provision when it "accelerat[ed] [Doris's] debt under the note because of her death." *Id.* ¶ 83. Sandra's second theory is that a different federal statute, 15 U.S.C. § 1639f(a), "mandates that [loan] servicers credit periodic payments on consumer credit transaction[s] secured by a consumer's principal dwelling as of the date of receipt." Am. Compl. ¶ 89. She claims that MidCountry's "return of accepted payments and failure to apply those payments" violated § 1639f(a) and "is a breach of the contract." *Id.* ¶ 90.

The parties agree that Minnesota law governs Sandra's breach-of-contract claim. *See* Defs' Mem. in Supp. [ECF No. 16] at 14; Pl.'s Mem. in Opp'n [ECF No. 19] at 10–11 (citing Minnesota law). Under Minnesota law, a breach-of-contract claim requires: "(1) a

---

[2]   Sandra alleges that the regulation cited in the contract, 12 C.F.R. § 591, has been "recodified a 12 C.F.R. § 191." Am. Compl. ¶ 81. The specific limitations on the exercise of due-on-sale clauses to which the contract refers appear in 12 C.F.R. § 191.5.

9

valid contract; (2) performance by the plaintiff of any conditions precedent; (3) a material breach of the contract by the defendant; and (4) damages." *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 989 (D. Minn. 2006) (citation omitted); *see Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011) (same).  Under Minnesota law, "the primary goal of contract interpretation is to determine and enforce the intent of the parties." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003).  When contract language is unambiguous, the "language must be given its plain and ordinary meaning." *Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999) (footnotes omitted).  A contract is ambiguous only when its terms "are susceptible to more than one reasonable interpretation." *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018).  "The determination of whether a contract is ambiguous is a question of law, but the interpretation of an ambiguous contract is a question of fact for the jury." *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003) (citations omitted).

Sandra's first theory—that the contract incorporated a federal regulation that MidCountry breached—is not plausible because the contract unambiguously did not incorporate the regulation as a term or terms of the contract.  After describing MidCountry's due-on-sale right, the contract says that the "right is *subject to* the restrictions imposed by" the regulation.  ECF No. 9-2 ¶ 7 (emphasis added).  Ordinarily, the phrase "subject to" means that a person or thing is "dependent or conditional upon" or "under the authority of."  New Oxford American Dictionary 1733 (3d ed. 2010); *see Subject to*, Meriam-Webster Dictionary Online, https://www.merriam-

webster.com/dictionary/subject%20to (last visited Sept. 10, 2023) (defining "subject to" as "affected by or possibly affected by (something)"). The contract here is consistent with these definitions. In other words, the contract acknowledges that enforcement of its due-on-sale provision might be subject to restrictions imposed by a federal regulation just as an employment contract might acknowledge that the employer/employee relationship is governed by federal and state anti-discrimination laws. But that acknowledgment is not enough to incorporate the regulation or its surrounding legal regime as terms of the contract.

Cases support this interpretation. In *Burgmeier v. Farm Credit Bank of St. Paul*, a plaintiff alleged that the defendant bank "breached [a] mortgage contract that allegedly incorporated by reference provisions of the Farm Credit Act." 499 N.W.2d 43, 47 (Minn. Ct. App. 1993). The mortgage provided that "[the stock was] held by the [Federal Land Bank Association of Willmar] as collateral security for the payment of said loan, subject to all the provisions of the Farm Credit Act of 1971." *Id*. at 45. The court rejected that this term in the mortgage contract incorporated by reference provisions of the Farm Credit Act. *Id*. at 47. Instead, the court reasoned that "[h]ere, the mortgage stated that it was 'subject to' the Farm Credit Act. The mortgage's language is not ambiguous. This language alone is insufficient to create rights or obligations in the parties, and cannot support a breach of contract action." *Id*. at 47. In *Gurfein v. Ameritrade, Inc.*, a plaintiff alleged that "Ameritrade breached its contract by failing to comply with NASD, SEC and AMEX rules." 312 F. App'x 410, 412 (2d Cir. 2009) (summary order). Ameritrade's Terms and Obligations stated, "*In consideration of Ameritrade handling options*

*transactions for my account, I am aware of and agree as follows:* . . . All my option transactions are subject to the rules and regulations of the Options Clearing Corporation, the Chicago Board Options Exchange or the appropriate options exchange, and the National Association of Securities Dealers, Inc." *Id*. at 413.  The court concluded:

> This section, drafted in the first person, memorializes only Gurfein's acknowledgment that her trades are subject to applicable rules and regulations.  The unambiguous language at issue puts Gurfein on notice that her electronic trades are governed by various entities' regulatory rules.  The language, however, does not incorporate into the contract the rules and regulations of those outside regulatory bodies.  Nor does it impose any contractual obligations on Ameritrade.

*Id*.  Finally, there is *Luis v. RBC Cap. Mkts., LLC*, 984 F.3d 575 (8th Cir. 2020).  In that case, former clients of the defendant investment bank argued that a "Client Account Agreement" created a contractual duty for the defendant to comply with Financial Industry Regulatory Authority ("FINRA") rules.  *Id.* at 576, 580.  The Client Account Agreement read as follows:

> **16. APPLICABLE LAW AND REGULATIONS**
>
> All transactions in my Account shall be subject to all applicable laws and the rules and regulations of all federal, state and self-regulatory agencies, including, but not limited to, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the New York Stock Exchange, Inc., ("NYSE"), FINRA, the Board of Governors of the Federal Reserve System, and the constitution, rules, and customs of the exchange or market (and the related clearing facility or entity) where executed, as the same may be amended or supplemented from time to time.

*Id.* at 577.  Analyzing Minnesota law, the Eighth Circuit concluded that "[t]he 'subject to' language in Paragraph 16 does not create a contractual duty. Rather, it is an

acknowledgment by the clients that RBC will comply with FINRA rules." *Id*. at 580. The court cited to *Burgmeier and Gurfein*, reasoning that "*Burgmeier* and *Gurfein* accurately predict how the Minnesota Supreme Court would interpret the 'subject to' language." *Id*. at 581–82. Sandra identifies no reason why the same construction might be inappropriate here.[3]

Sandra's second breach-of-contract theory—that MidCountry's "return of accepted payments and failure to apply those payments" violated TILA, 15 U.S.C. § 1639f(a), and "is [therefore] a breach of the contract," Am. Compl. ¶ 90—fails for a more fundamental reason. The contract nowhere mentions, much more incorporates the terms of, TILA, § 1639f(a), or its requirement that loan servicers credit periodic payments on a consumer credit transaction secured by a consumer's principal dwelling "as of the date of receipt." 15 U.S.C. § 1639f(a). Nor does the Amended Complaint tether the asserted unlawfulness of MidCountry's return of payments to a legal authority other than § 1639f(a). Sandra does

---

[3] The Amended Complaint cannot reasonably be understood to assert a direct claim under either 12 C.F.R. § 191.5 or its authorizing legislation, the Garn-St. Germain Depository Institutions Act of 1972, 12 U.S.C. § 1701j-3. The Amended Complaint includes no count or cause of action styled as such. On the contrary, the Amended Complaint discusses the regulation and Act exclusively as a source for the breach-of-contract claim. Regardless, had Sandra sought to assert a direct claim under the regulation or Act, the claim would be implausible. Defendants cite several cases in their opening brief for the proposition that the Garn-St. Germain Act includes no private right of action. *See Estate of Cornell v. Bayview Loan Servicing, LLC*, 908 F.3d 1008, 1013–14 (6th Cir. 2018); *Nelson v. Nationstar Mortg. LLC*, No. 7:16-CV-00307-BR, 2017 WL 1167230, at *2 (E.D.N.C. Mar. 28, 2017); *Turman v. Wells Fargo Bank, N.A.*, No. 3:15-cv-1119, 2016 WL 5467947, at *3 (M.D. Tenn. Sept. 29, 2016); *Dupuis v. Yorkville Fed. Sav. and Loan Ass'n*, 589 F. Supp. 820, 821–22 (S.D.N.Y. 1984). Sandra does not cite, and research has not disclosed, a case holding that the Act includes a private right of action. Any direct claim under the Act would therefore be futile.

not allege, for example, that MidCountry's return of payments breached some particular contractual provision. The absence of contractual support—*i.e.*, the fact that the contract does not incorporate § 1639f(a) and that Sandra identifies no other contract term that might be a source of her claim regarding the returned payments—dooms this theory.

B

Sandra next asserts a claim against MidCountry directly under TILA. Like her second breach-of-contract theory, this claim arises from MidCountry's alleged acceptance and return of Sandra's payments on the credit line. *See id.* ¶¶ 94–99. Sandra claims that, "[b]y returning these payments after crediting them," *id.* ¶ 101, MidCountry violated TILA's requirement "that servicers credit periodic payments on [a] consumer credit transaction secured by a consumer's principal dwelling as of the date of receipt," *id.* ¶ 100.

Begin with the statute on which this claim is based, 15 U.S.C. § 1639f(a). It provides, in relevant part:

> In connection with a consumer credit transaction secured by a consumer's principal dwelling, no servicer shall fail to credit a payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer or in the reporting of negative information to a consumer reporting agency . . . .

*Id.* "This provision's implementing regulation, known as Regulation Z, essentially repeats this requirement." *Fridman v. NYCB Mortg. Co., LLC*, 780 F.3d 773, 775–76 (7th Cir. 2015) (citing 12 C.F.R. § 1026.36(c)(1)(i)). The Seventh Circuit addressed the purpose of this statute in *Fridman*. There, the court held "that an electronic authorization for a mortgage payment entered on the mortgage servicer's website is a 'payment instrument or

14

other means of payment'" and that, as a result, § 1639f(a) required the servicer to credit the account when the servicer received the electronic authorization. *Id.* at 780. The court explained:

> The interpretation we adopt promotes an important purpose of TILA: to protect consumers against unwarranted delay by mortgage servicers. When a consumer interacts directly with a mortgage servicer (such as by delivering a check, personally paying by telephone, or filling out an electronic authorization form on a servicer's website), it is the servicer that decides how quickly to collect that payment through the banking system. Nothing dictates when the servicer must deposit the check, use the payment information given over the phone to receive payment, or place the electronic authorization information in an ACH file and collect the funds through the EPN. The servicer is in control of the timing, and without the directive to credit the payment instrument when it reaches the servicer, the servicer could decide to collect payment through a slower method in order to rack up late fees. . . . The opportunity (and perhaps even incentive) to delay the crediting of accounts explains TILA's "date of receipt" requirement. Reading TILA to require mortgage servicers to credit electronic authorizations when they are received protects consumers from this unwarranted—and possibly limit-less—delay.

*Id.* at 779–80; *see Ikeda v. San Francisco Firemen Credit Union*, No. 20-cv-08071-TSH, 2021 WL 4776705, at *15 (N.D. Cal. Oct. 13, 2021) (describing same essential purposes). In view of these purposes, "no TILA violation occurs when a servicer's delay does not result in late charges, additional interest, or similar penalties." *Kier v. Ocwen Loan Servicing, LLC*, 122 F. Supp. 3d 786, 791 (N.D. Ill. 2015).

Sandra does not plead a viable TILA claim under § 1639f(a) because she does not plausibly allege that MidCountry failed to credit a payment to her loan account as of the date of receipt. Sandra seems to allege something different—that MidCountry initially

15

accepted payments made in December 2021 and February 2022. *See* Am. Compl. ¶¶ 25, 39, 40. She does not allege that MidCountry failed to credit the account for those payments as of the date of receipt. She alleges instead that MidCountry refunded those payments in March 2022. *See id.* It is difficult to understand how the allegation that a creditor or servicer improperly returned a payment that originally was credited in compliance with § 1639f(a) shows a violation of § 1639f(a). And Sandra does not allege that MidCountry's actions caused her to incur late charges, additional interest, or similar penalties resulting from delayed crediting—the specific types of harm the statute was designed to guard against. Sandra's alleged harms all resulted from what she alleges was a wrongful foreclosure. *See* Pl.'s Mem. in Opp'n at 13 (describing the injury as "improperly and illegally assessed late charges, interest, and costs and fees related to the foreclosure"). Sandra cites no factually similar case or other authority to support this claim, *see* Pl.'s Mem. in Opp'n at 12–13, and a review of federal cases addressing § 1639f(a) claims yields no case in which a court accepted a comparable theory.

C

For her third claim, Sandra alleges that Taft violated the Fair Debt Collection Practices Act by prosecuting the foreclosure action though MidCountry possessed "no present right to possession of the property." *Id.* ¶¶ 106, 112–13. Sandra claims that Taft thus "violated multiple provisions of the FDCPA including, but not limited to" the use of "unfair or unconscionable means to collect or attempt to collect a debt" in violation of 15 U.S.C. § 1692f(6). *Id.* ¶ 114. The entry of judgment against Sandra's breach-of-contract and TILA claims leaves some uncertainty regarding the basis for this claim.

16

Regardless, the motion will be denied because, insofar as Sandra's claim under § 1692f(6) is concerned, the motion depends on materials that cannot appropriately be considered at this stage and would require rejecting the Amended Complaint's allegations in favor of Defendants' description of the facts. Defendants argue that MidCountry had a right to foreclose because Sandra failed to pay monthly in full as required by the contract. Defs.' Mem. in Supp. at 25–26. Defendants support their position exclusively with MidCountry-generated exhibits, such as the account billing statements and past due notices, that seek to challenge the truthfulness of the Amended Complaint's factual allegations. As discussed earlier in Part II, those documents are not embraced by the pleadings, contradict the Amended Complaint's allegations, and cannot be considered on a Rule 12(c) motion.[4]

---

[4] In her original Complaint, Sandra alleged that Taft violated FDCPA provisions in addition to 15 U.S.C. § 1692f(6), including 15 U.S.C. §§ 1692e(2)(A), 1692e(5), and 1692f(1). In support of its Rule 12(c) motion, Taft argued that the FDCPA makes it subject to suit under only § 1692f(6). Defs.' Mem. in Supp. at 23–24. Sandra did not respond to this argument in her opposition brief. *See* Pl.'s Mem. in Opp'n at 13–14. And in her Amended Complaint, Sandra dropped any explicit reference to FDCPA provisions other than § 1692f(6). I read the Amended Complaint to assert an FDCPA claim under only § 1692f(6). If that understanding were incorrect, Sandra's failure to respond to Taft's arguments means she has waived any FDCPA claim other than under § 1692f(6). *See Doe v. Mayorkas*, No. 22-cv-00752 (ECT/DTS), 2022 WL 4450272, at *2 (D. Minn. Sept. 23, 2022) (citing *Espey v. Nationstar Mortg., LLC*, No. 13-cv-2979 (ADM/JSM), 2014 WL 2818657, at *11 (D. Minn. June 19, 2014)).

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendants' Motion for Judgment on the Pleadings [ECF No. 14] is **GRANTED in part and DENIED in part** as follows:

1. The Motion is **GRANTED** to the extent it seeks entry of judgment on the pleadings against the claims asserted in Count I (Breach of Contract Against MidCountry Bank) and Count II (Violations of TILA Against MidCountry Bank) of the Amended Complaint. Counts I and II are **DISMISSED WITHOUT PREJUDICE**.

2. The Motion is **DENIED** to the extent it seeks entry of judgment on the pleadings against the claim asserted in Count III (Violations of FDCPA Against Taft) of the Amended Complaint.

Dated: September 11, 2023

s/ Eric C. Tostrud  
Eric C. Tostrud  
United States District Court